UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FLEET AND FARM OF GREEN BAY, INC.,

    Plaintiff,

  v.                                                          Case No. 13-C-1013

UNITED FIRE AND CASUALTY CO.

    Defendant.

## DECISION AND ORDER

This insurance dispute arises out of an injury occurring at a Mills Fleet Farm store. The parties to the underlying lawsuit settled the claims, and now the Plaintiff ("Mills") seeks summary judgment declaring that Defendant United Fire and Casualty Company owed a duty to provide Mills with a defense in the underlying lawsuit. Both sides have moved for summary judgment. For the reasons given below, Mills' motion will be granted and United's will be denied.

**I. Background**

Mills sells a wide array of outdoor goods, including bricks and patio blocks made by Country Stone, Inc. As a condition of doing business, Mills requires its suppliers to list Mills as an additional insured under their policies, and so when it agreed to sell blocks made by Country Stone, Inc., it became an additional insured under Country Stone's CGL policy with United Fire & Casualty, the defendant.

In May 2011, Margaret Schaefer was picking up an order of Country Stone patio blocks at

a Mills Fleet Farm store in Baxter, Minnesota. The blocks were stacked and bundled, wrapped in plastic, on a wooden pallet. When a Mills employee cut the wrapper to remove Schaefer's blocks, the pallet gave way and the blocks fell onto Schaefer's leg, causing significant injuries.

Mills soon contacted its third-party claims administrator, a company now known as SRS. Eventually, in November 2011, SRS got in touch with United Fire, faxing it information about the accident, as well as letters SRS had received from Schaefer's attorney.

United Fire conducted a limited investigation. Its adjuster, John Niewald, interviewed a Country Stone employee and communicated with SRS through email. He also communicated with Schaefer's attorney and received photos of the accident scene. In an internal report dated November 19, Niewald noted that Mills, through SRS, had put its insured (Country Stone) on notice of the claim and had tendered the defense to it. (ECF No. 46-10 at 10.) The report discusses United's potential liability, which (if at all) would fall under the Ultra Liability Plus endorsement. (*Id.* at 11.) The report then notes that Country Stone believed the accident might have been due to damage to the pallet caused by a Mills employee operating the forklift. "Before we could accept any liability . . . we would need to document the facts of this incident which would include statements from the clmt and the Mills Fleet Farm employees who witnessed this incident." (*Id.*) The report further concluded that "we will be denying the tender of the defense and handling of the claim." (*Id.* at 12.)

In a November 29, 2011 letter to SRS, United stated that "we are denying your tender of the defense and handling." (*Id.* at 20.) "We have not been presented with any evidence of any negligence on our insured that in any way contributed to this harm." (*Id.*) United wrote a similar letter to Schaefer's personal injury attorney. Even though it was denying coverage and defense,

2

it continued to investigate and obtained Schaefer's medical records. Through continued communications with Schaefer's lawyer, United learned that Schaefer would soon be filing a lawsuit. (*Id.* at 23.)

The lawsuit was filed against Mills in March 2012, and Mills served a third-party complaint on Country Stone in August of the same year. The Plaintiff then filed an amended complaint naming Country Stone as a defendant, and United provided a defense to Country Stone, its insured.

In 2013, in the context of that litigation, Mills' lawyers contacted United and stated their view that United had breached its duty to defend Mills in that lawsuit. They also alerted United to Mills' ongoing defense costs, which Mills expected United to pick up. In response, United claimed Mills was not an additional insured under its policy, and it also cited an exclusion for claims arising out of the "repackaging" of its product. In short, United saw "no compelling reasons to overrule John Niewald's 29 November 2011 declination letter to" SRS. (ECF No. 46-20.) Later that month, it responded to another demand by noting that Niewald had not been provided sufficient documentation to support the idea that Mills had been an additional insured. Additionally, it cited the fact that Mills has not been cooperative in allowing witnesses to speak to Niewald. (ECF No. 46-22.) Mills instituted the present lawsuit against United soon after.

**II. Analysis**

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A court's interpretation of the terms and coverage of an insurance policy is purely a question of law and therefore appropriately resolved on summary judgment. *Brown & LaCounte, L.L.P. v. Westport Ins. Corp.*, 307 F.3d 660, 662 (7th Cir. 2002). Here, some of United's arguments have a factual component

3

as well, but I am satisfied that it has not established a sufficiently genuine issue of fact to be able to survive summary judgment.

**A. Schaefer's Complaint Triggered the Duty to Defend**

United argues that the duty to defend under its policy was never triggered at all. This is not its primary argument, but I address it first because it appears that the rationale underlying this argument is what drove its initial denial of coverage in the first place. The original Schaefer complaint, which named only Mills as a defendant, alleged Mills was liable for negligence—failing to maintain a safe environment, failing to properly train staff, failing to warn, failing to exercise due care, and the like. Notably absent from that complaint, United argues, was any allegation that Country Stone, the named insured, was negligent in any fashion or that the stones were defective. As such, and based on Wisconsin's "four corners of the complaint" test, United argues that the duty to defend was not triggered.

The "four corners of the complaint" test refers to the general rule Wisconsin follows in determining whether an insurer has a duty to defend a lawsuit tendered to it: "The duty to defend is triggered by the allegations contained within the four corners of the complaint." *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶ 20, 311 Wis.2d 548, 751 N.W.2d 845. If a claim is alleged that falls within the coverage provisions of the policy and it is not clearly excluded, the insurer has a duty to defend, even if the allegations are believed to be groundless, false or fraudulent. *Id.; Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 19, 261 Wis.2d 4, 660 N.W.2d 666. But there are exceptions to this general rule. *Grieb v. Citizens Casualty Co.*, 33 Wis.2d 552, 558, 148 N.W.2d 103, 106 (1967).

United argues that it had no duty to defend Mills because the claim asserted in the

4

Schaefer's original complaint did not fall within the coverage provisions of its policy. Schaefer's original complaint alleged that she was injured when, while at the Mills' Fleet and Farm store in Baxter, Minnesota, an employee of the store caused paving stones to fall on her. (ECF No. 46-3 at ¶ 3.) There was no mention of Country Stone or any conduct on its part. United argues that based solely on the allegations of the complaint, it had no duty to defend Mills.

United's argument rests on its assumption that its only insured was Country Stone. In United's view, it owed no duty to defend Mills because "We have not been presented with any evidence of any negligence on our insured that in any way contributed to this harm." (ECF No. 46-10 at 20.) It is true that the original complaint did not mention any negligence on the part of Country Stone. But it didn't need to because Country Stone was not the only insured under its policy of insurance with United. The policy also provided coverage to Country Stone's "Vendors" which it defined as "[a]ny person of organization (referred to below as vendor), but only with respect to 'bodily injury' or 'property damage' arising out of 'your products', which are distributed or sold in the regular course of the vendor's business ...." (ECF No. 46-23 at 27.) Mills was just such a vendor, and the bodily injury Schaefer suffered arose out of Country Stone's products which Mills distributed and sold in the regular course of its business.

United apparently took the position early on that it had no duty to defend or indemnify Mills unless its named insured, Country Stone, was alleged to have been negligent. That is not what its policy says, however. United's policy made Mills an additional insured as to any liability for bodily injury "arising out of" Country Stone's products. When large paver stones fall on someone's leg, the bodily injury "arises out of" those stones. Accordingly, it does not matter that the complaint fails to allege negligence on Country Stone's part (although that came later). It is

5

enough that Country Stone's product caused the injury. The mere fact that the complaint does not allege negligence on the *original* insured's part does not mean the vendor is not an additional insured under the policy or that there is no duty to defend.

It is true that in some cases, a party is not deemed an additional insured under a policy unless the allegations in the complaint are tied to the negligence of the named insured. For example, in a recent Illinois case, the policy at issue contained the following limit: "Such person or organization is an additional insured only with respect to liability incurred solely as a result of some act or omission of the named insured and not for its own independent negligence or statutory violation." *Pekin Insurance Co. v. Hallmark Homes, L.L.C.,* 392 Ill.App.3d 589, 595, 332 Ill.Dec. 64, 912 N.E.2d 250 (2009). That court, not surprisingly, concluded that "*Under the language of the policy*, Hallmark Homes is an additional insured entitled to coverage so long as it is (or potentially could be) liable solely as a result of [the original insured's] acts or omissions." *Id.* (italics added). *See also* King Cole Condominium Ass'n, Inc. v. Mid-Continent Cas. Co. 21 F.Supp.3d 1296, 1298 (S.D.Fla.,2014) (policy defined additional insured as "the person or organization shown in the Schedule, but only with respect to liability directly attributable to your performance of ongoing operations for that insured.")

This is the kind of result United seeks here, but its policy language does not support its argument. By stark contrast, the "additional insured" provision in this case contains no limitation on coverage that would require any allegation whatsoever about the named insured's conduct. Instead, it simply provides coverage for claims "arising out of" Country Stone's product sold in the normal course of the vendor's business. The provision also excludes a number of scenarios, such as physical change of the product by the vendor or repackaging the product, but none of these are

6

applicable here. In fact, the very existence of some of the exclusions presupposes that no negligence need be alleged on the part of the named insured, because otherwise the exclusions would be surplusage.

Other courts have rejected the argument United now makes. In *Regal Homes, Inc. v. CNA Insurance,* the named insured was determined to be free of fault in earlier litigation, and thus there was no negligence alleged on the part of the named insured. 217 Ariz. 159, 171 P.3d 610, 614 (Ariz. Ct. App. 2007). Even so, that court found the broad language of the policy ("arising out of") did not require negligence by the named insured but merely an allegation that the accident was "incident to or connected with" the named insured's activity. Thus, the party was properly deemed an additional insured even though there was no allegation of fault against the named insured. Similarly, in *Marathon Ashland Pipe Line v. Maryland Casualty Co.,* the Tenth Circuit reversed a decision that interpreted policy language to require negligence on the part of the named insured before coverage came into effect. 243 F.3d 1232, 1237 (10th Cir. 2001). In that case, additional insured coverage was triggered for liability "arising out of [the named insured's] ongoing operations." *Id. See also Liberty Mut. Ins. Co. v. Zurich American Ins. Co.,* 2014 WL 1303595, *6 (S.D.N.Y. 2014) (citing cases); *Mega Const. Corp. v. Quincy Mut. Fire Ins. Co.,* 42 F.Supp.3d 645, 655 (E.D.Pa. 2012) (noting that "additional insured endorsements with language similar to this one may cover liability arising out of the additional insured's own negligence."); *see also* Turner, Scott C., Insurance Coverage of Construction Disputes § 42:3 "'Arising out of' qualification" (Database updated November 2014) ("As the phrase arise out of is both broad and vague, it must be liberally construed in favor of the insured.").

Despite the broad language of its policy, United has been laboring under a misconception

7

that additional insured coverage exists only when a suit alleges fault on the part of its named insured. It would not have been difficult to employ such language. *See, e.g, Bay State Gas Co. v. Robert J. Devereaux Corp.,* 2012 WL 5378084, *5 (Mass.Super. 2012) ("The policy further adds that '[t]here is no coverage for the additional insured … arising out of the sole negligence of the additional insured or by those acting on behalf of the additional insured.'") The actual policy language here is much broader, however, and requires only that (1) the injury "arise out of" the insured's product, and (2) that product must be sold by the vendor in the normal course of business. Both of those things occurred here.

Mills notified United that it was an additional insured under Country Stone's policy by virtue of its status as one of Country Stone's vendors within three months of Schaefer's injury. An insurer is not bound by the four corners of the complaint in determining whether the defendant is its insured. Otherwise the duty to defend would never arise absent the complaint expressly naming the insurer. Having been told that it was its named insured's paving stones that caused Schaefer's injury, United should have known that Mills was also insured under its policy based on the allegations of the complaint. In any event, in an amended complaint filed less than seven months later, Schaefer identified Country Stone as the manufacturer of the paving stones and expressly alleged that Country Stone was negligent in the manner in which it packaged, shipped and supplied the paving stones to Mills. Nevertheless, United continued to insist it owed no duty to defend Mills. Based on the allegations of the complaint and the terms of its policy, I conclude that United owed Mills a defense to Schaefer's lawsuit as an additional insured under Country Stone's policy. I now turn to United's remaining defenses.

8

**B. United Had Adequate Notice of the "Suit"**

The applicable policy indicates that the insurer has a duty to defend a "suit." (ECF No. 46-23 at 3.) The "suit" in question here is the Minnesota state court lawsuit instituted by Schaefer, the injured party, against Mills. That lawsuit was filed in March 2012. Prior to that, of course, Mills (through SRS) and United had been engaged in substantial correspondence, and United had denied the tender of the claim in November 2011. Once the lawsuit was filed, though, Mills never alerted United about the "suit" until 2013, when it complained that United had violated its duty to provide a defense. Given the lack of notice provided by Mills, United argues that it did not have any duty to defend the lawsuit.

The policy requires the insured to provide written notice of the suit "as soon as practicable" and to "immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" (ECF No. 46-23 at 32.) United concedes, as it must, that it received notice and even investigated the underlying accident in 2011, but it states that because there was no "suit" at that time, the parties' discussions at that time did not constitute a tendering of the "suit." Under the policy, it has the discretion to investigate "claims," but its duty to defend is not triggered until a "suit" is filed.

It is true that Mills did not immediately tender Schaefer's lawsuit to United. But the policy imposes a duty to defend a "suit," not a duty to defend a "suit of which we receive timely notice" or something to that effect. That is, there are no time qualifications contained in the policy language governing the duty to defend. Although the insured has a duty to timely notify the insurer of lawsuits, that is a separate obligation, not a condition or limitation as to what kinds of lawsuits the insurer must defend. For example, the policy also requires an insured to provide the insurer

9

with *written* notification of suits or claims. Suppose that the insured merely provides *oral* notification. In that event, it simply means the insured has breached one of its duties under the policy, a breach that might well prove irrelevant. (The insurer could simply waive the requirement and proceed, or ask that the documentation be provided in writing.) The failure to provide *written* notice certainly does not mean that the "suit" need not be defended by the insurer.

Similarly, an insurer may be obligated to defend an *un*timely-tendered lawsuit if it has suffered no prejudice as a result of the delay, for example, because it already knew about the lawsuit. Here, Mills argues that the insurer clearly knew about the accident in question in November 2011, and it knew Mills desired that United take up the defense of the claim. Once the "suit" was filed in 2012, United's own insured was brought into the lawsuit within a matter of months, and so United clearly understood that the "suit" against Mills existed soon after it was filed. The fact that Mills did not specifically contact United about it until 2013 (when Mills alleged United had breached its duty to defend) is largely irrelevant given the other facts cited. The policy imposes obligations on the insured to make timely notifications to the insurer. But those provisions are designed to ensure that the insurer is given proper notice and has an opportunity to investigate. When the insurer *already* has received such notice, or when it obtains knowledge of a lawsuit through other means, the provisions governing an insured's duty to notify will not allow an insurer to escape liability. *See also* Wis. Stat. § 632.26(2).

United argues that it was prejudiced by the delay, in part, because it was not able to secure the counsel of its choice to defend Mills. *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.,* 261 Wis.2d 4, 38-39, 660 N.W.2d 666, 683 (Wis. 2003) ("An insurer is prejudiced by late notice when, for example, it cannot investigate the facts necessary to determine whether coverage should be

10

Case 1:13-cv-01013-WCG   Filed 05/22/15   Page 10 of 16   Document 58

provided and when it has been denied the opportunity to have input into the manner in which the underlying claim is being defended."). It notes that Mills' attorney charged $415 per hour and spent more than 700 hours on a run-of-the-mill broken ankle case that ended up settling for only $95,000 from Mills. (Mills' attorney would no doubt argue that the low settlement amount was the product of the attorney's extensive efforts.)

Regardless of the wisdom of Mills' approach to the litigation, the fact remains that Mills asked United to handle the claim, and United declined, knowing full well that the injured party's attorney was planning to bring a lawsuit in the near future. Then, when that lawsuit was actually filed a few months later, United's own insured was quickly made a party, thus alerting United once again to the fact that Mills, an additional insured, had been sued. When the insurer receives actual notice of the claim from an insured, and then receives notice of the "suit" from another source, it cannot rely on the policy's notification provisions to later claim it was somehow prejudiced. *Casualty Ins. Co. v. E.W. Corrigan Const. Co., Inc.,* 247 Ill. App. 3d 326, 187 Ill. Dec. 20, 617 N.E.2d 228, 232 (1st Dist. 1993) ("notice to an insurer of an occurrence need not be given by the insured to be sufficient; any responsible party may be the source of the information as long as a reasonable notice is given.")

This is particularly true given the facts of this case. Having alerted United to the underlying accident, what more was Mills supposed to do once United clearly and unambiguously rejected the tender in November 2011? United rests much of its defense on a distinction between a "claim" and a "suit," but the difference is not as large as United suggests. Under these circumstances, Mills was not merely tendering a "claim" to the insurance company, as it would if it had suffered a loss *itself*, such as hail damage or theft. Instead, it was anticipating that someone *else,* a third party, would

11

be filing a lawsuit against Mills in the near future, and it wanted United to take responsibility. Practically speaking, there was no other purpose to notifying United about the claim other than the fact that everyone knew a lawsuit lay in the near future. Mills was not telling United about the accident just because it was a piece of breezy gossip—it was telling United because it anticipated a "suit" and wanted United to defend it. Tellingly, this is how both sides treated the notice at the time: in its November 29, 2011 letter to SRS, United stated that "we are denying your tender of the *defense* and handling." (*Id.* at 20.)(italics added). The only thing one would have a "defense" against under these circumstances would be a "suit," and so United's denial of the "defense" anticipated and thus applied to the lawsuit that was soon filed. Having been rejected by United, Mills was under no obligation to re-tender the lawsuit a few months later.

Finally, United's focus on timely notification is misplaced because it is clear that notification would have been futile in any event. As discussed above, United has been consistent in its position that there was no coverage and no duty to defend the lawsuit against Mills. Thus, even if Mills had immediately notified United of the lawsuit when it was filed in 2012, United would again have denied responsibility, just as it did in 2011 and 2013. Thus, any notion that it is "prejudiced" by a lack of notice is undermined by the fact that it would not have accepted the defense even if it had been timely tendered.

**C. Mills' "Failure to Cooperate" does not Impact the Duty to Defend**

The policy requires an insured to "cooperate with us in the investigation or settlement of the claim or defense against the 'suit.'" (ECF No. 46-23 at 13.) United argues that Mills breached its duty to cooperate in the investigation when SRS, Mills' claim processor, refused to allow Mills' employees to speak to United during the course of United's 2011 investigation. Mills notes that

12

all of the parties to the underlying litigation refused to make witnesses available, and thus there was nothing unusual about its decision.

As discussed in Section B above, the allegation that an insured breached an obligation under the policy does not mean that the insurer necessarily escapes its duty to defend. As with the duty to notify an insurer "as soon as practicable," the obligation to "cooperate" cannot be grounds for denial unless the insurer gives a plausible reason explaining how the alleged failure to cooperate materially prejudiced its ability to tender a defense. "To establish the defense of noncooperation, a liability insurer must prove (1) a breach of the duty to cooperate and (2) actual rather than merely possible prejudice resulting from the breach." *County Seedmen, Inc. v. Knapp,* 142 Wis. 2d 948, 1987 WL 42552, *1 (Wis. Ct. App. 1987).

Although Mills' cooperation might pose a factual question, United has not attempted to explain in any depth how it suffered actual prejudice due to the inability to speak to Mills' employees. First, at the time it rejected the tender, it explained that "We have not been presented with any evidence of any negligence *on our insured* that in any way contributed to this harm." In other words, its basis for denial of coverage was its belief that its *own* insured was not negligent. Therefore, its current explanation for denying coverage is at odds with what it told Mills at the time of the denial.

Second, United never alerted Mills that its failure to produce witnesses could impact United's decision to provide a defense. United has not cited any cases holding that an insurer may rely on a non-cooperation defense three years after the fact when it never told the insured that coverage was dependent on the cooperation the insurer sought, particularly when the insurer's stated reason for denial had nothing to do with cooperation.

13

Finally, the futility of cooperation is evident from United's own internal notes. United stated internally that it could not accept liability without interviewing Mills' employees, but then concluded, in the same document, that it would deny the tender anyway, that is, *without* interviewing any witnesses. Nowhere does United cite the alleged failure to cooperate as a reason to deny coverage, at least until two years later. Moreover, notes from the adjuster's supervisor indicate that policy interpretation, not Mills' cooperation, was crucial to its decision. United stated that it would deny "tendering a defense" if the supervisor would "agree w/ our coverage analysis." (ECF No. 46-10 at 18.) Specifically, the "coverage analysis" had identified two clauses in the policy that the supervisor believed would exclude coverage for the accident. (*Id.* at 17.) Thus, the impression both internally and externally was that United's coverage decision was *not* dependent on cooperation from Mills but on (1) United's belief that policy exclusions would preclude coverage, and (2) the lack of any evidence of negligence on the part of Country Stone, its *own* insured. Later United's explanation changed again, with United claiming that there was insufficient evidence that Mills was even an additional insured; it also cited the "repackaging" exclusion, which it has apparently since abandoned. The inescapable conclusion is that United was always going to deny the claim, with or without investigation, for any number of reasons. Accordingly, Mills' alleged lack of cooperation appears to be nothing but an *ex post facto* rationale that remains unconvincing.

**D. United was Primary**

Finally, United argues that Mills was self-insured under its own policy with Hartford. Specifically, it agreed to pay the first $250,000 of its defense costs under that policy. Under Wisconsin law, self-insurance constitutes "other insurance," and thus, United argues, United cannot

14

be deemed primary for the first $250,000 of Mills' defense costs.

The parties agree that Mills' Hartford policy was excess over any other insurance and that Mills self-insured under that policy for the first $250,000. The question is whether United's policy provided Mills primary insurance as an additional insured. The relevant policy language indicates that "this insurance is primary except when b. below applies." (ECF No. 46-23 at 29.) Section b. indicates that "this insurance is excess over any of the 'other insurance' . . . (6) That is provided to any person or organization who qualifies as an additional insured herein, except when you and that person or organization have agreed in writing that this insurance shall be primary." (*Id.*) Thus, anyone insured as an additional insured would only be entitled to excess coverage unless the parties had agreed in writing to the contrary.

Mills argues that it agreed in writing with Country Stone that United's policy would provide primary coverage. Pursuant to the terms and conditions of its purchase orders, Country Stone agreed to make Mills an additional insured under its own policy. The relevant portion of the purchase order reads as follows:

> Supplier agrees to make Purchaser an additional insured under its liability insurance policy . . . Supplier further agrees that failure to name Purchaser as an additional insured . . . does not relieve the Supplier or its liability carrier of its duty to indemnify Purchaser on a primary, non-contributory basis against all claims, damages and / or expenses as described herein.

(ECF No. 46-5 at 7.)

United argues that this clause does not explicitly state that Mills and Country Stone agreed that Country Stone's insurance would be primary because it merely requires Country Stone to make Mills "an additional insured." (*Id.*) Although the clause refers to a "duty to indemnify Purchaser on a primary, non-contributory basis," it does not specially *impose* such a duty.

15

It is true that the clause does not state with complete clarity that Country Stone must make Mills primary under its policy, but there is no other way to reasonably read the paragraph. It states that a failure to name Mills on the policy does not relieve the liability carrier of a duty to indemnify Mills on a primary basis. The only sensible implication of that is that the liability carrier's duty to indemnify is primary *regardless* of whether Country Stone named Mills as an additional insured or not. If the paragraph were construed in the fashion United suggests, the sentence would make no sense at all: it would mean that United was excess insurance if Country Stone named Mills as an additional insured, but that United was primary if, for example, Country Stone *forgot* to name it as an additional insured. Simply put, the clear point of the paragraph is that Country Stone's liability carrier has a duty to provide primary insurance without respect to whether Country Stone actually names Mills as an additional insured or not. Accordingly, I conclude that the parties agreed in writing that United's coverage would be primary. That means United's policy provided primary coverage to Mills.

### III. Conclusion

For the reasons given above, the motion for summary judgment filed by Fleet and Farm of Green Bay, Inc. is **GRANTED**. The motion filed by United Fire and Casualty Co. is **DENIED**. The clerk will schedule the matter for a telephonic conference to conduct further scheduling.

**SO ORDERED** this 22nd day of May, 2015.

 /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court